AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)     ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| United States of America | **FILED**<br>CLERK, U.S. DISTRICT COURT<br><br>10/9/2020<br><br>CENTRAL DISTRICT OF CALIFORNIA<br>BY: _____KH_____ DEPUTY |

United States of America

v.

CARA MARIE KIRK-CONNELL,

Defendant.

Case No.  **5:20-mj-00537**

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the dates of May 28, 2020, to on or about September 11, 2020, in the county of Riverside in the

Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1029(a)(2), 1028A(a)(1), and 1341 | Fraud and related activity in connection with access devices; Aggravated identity theft; and Frauds and swindles |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

**L O D G E D**
CLERK, U.S. DISTRICT COURT

10/9/2020

CENTRAL DISTRICT OF CALIFORNIA
BY: _____jgu_____ DEPUTY

_____/s/_____
*Complainant's signature*

Marcus Valle, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  _____October 9, 2020_____

City and state:  ___Santa Ana, California___

___/s/ Autumn D. Spaeth___
*Judge's signature*

Hon. Autumn D. Spaeth, U.S. Magistrate Judge
*Printed name and title*

AUSA: Charles Pell (714-338-3542)

# A F F I D A V I T

I, Marcus Valle, being duly sworn, declare and state as follows:

## I. BACKGROUND OF AFFIANT

1.    I am a Special Agent (SA) with the U.S. Department of Labor-Office of Inspector General (DOL-OIG), and have served in this capacity for seven years. I am presently assigned to the Los Angeles Regional Office of DOL-OIG.  My responsibilities as a DOL-OIG Special Agent include investigating unemployment insurance fraud, mail fraud, identity theft, as well as other related crimes.  I am a graduate of the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia.  As part of the training provided at FLETC, I successfully completed the Basic Training course, which included, but was not limited to, courses in criminal and constitutional law.

2.    Through my training and experience, including discussions with other law enforcement officers experienced in investigating crimes involving unemployment insurance and benefits fraud, I have become familiar with the methods used by people who commit benefits fraud offenses.

## II. PURPOSE OF AFFIDAVIT

3.    I make this affidavit in support of an support of a criminal complaint against, and arrest warrant for, Cara Marie KIRK-CONNELL (year of birth: 1988) for violations of Title 18, United States Code, Sections 1029(a)(2) (Fraud and related activity in connection with access devices); 1028A(a)(1) (Aggravated identity theft); and 1341 (Frauds and swindles).

1

4.    The facts set forth in this affidavit are based upon my personal observations, my review of the documents and records discussed herein, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

5.    The U.S. DOL-OIG, United States Internal Revenue Service, Criminal Investigations (IRS-CI), the United States Postal Inspection Service (USPIS), and the California Employment Development Department (EDD) are investigating a fraudulent scheme in which perpetrators fraudulently apply for and obtain unemployment insurance (UI) benefits under the Pandemic Unemployment Assistance (PUA) provisions of the federal CARES Act, a provision that is designed to help unemployed individuals obtain UI benefits as part of the nation's response to the economic harms caused by the COVID-19 pandemic.

6.    As set forth in greater detail below, in September 2020, local law enforcement arrested KIRK-CONNELL and discovered that she had in her possession multiple credit/debit cards in the names of other people issued by California EDD.  Search warrants of KIRK-CONNELL's hotel room and storage locations revealed documents containing identification information for

more than 50 people.  When interviewed, KIRK-CONNELL confessed
that she had used identity information of other people to apply
for unemployment benefits in their names, which resulted in her
receiving many EDD cards in other identities from the state of
California.

7.    Subsequent investigation uncovered that KIRK-CONNELL
had used identity information of approximately 50 people to
apply for and receive cards in those people's names with more
than $500,000 in COVID-related unemployment benefits from
California's EDD program, of which almost $270,000 had already
been spent.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

### A.    <u>Background on Unemployment Insurance Benefits</u>

8.    Since 1935, The U.S. Department of Labor's UI program
has provided unemployment benefits to eligible workers who
become unemployed through no fault of their own.  This program
ensures that at least a significant portion of the necessities
of life -- most notably food, shelter, and clothing -- are met
on a weekly basis while the worker seeks employment.  UI
beneficiaries who meet the requirements of the applicable state
law are eligible for this temporary financial assistance.  Each
state administers a separate UI program within the guidelines
established by Federal law.  In the state of California, EDD
administers the UI program for residents and others physically
performing work activities in California.

9.    Generally speaking, regular UI claimants must be:
(1) unemployed through no fault of their own; (2) able and

available for work; (3) willing to accept suitable work; and (4) actively seeking work.

      **B.**   **Pandemic Unemployment Assistance under the federal CARES Act**

     10.  On March 13, 2020, the President of the United States declared COVID-19 an emergency under the Robert T. Stafford Disaster Relief and Emergency Assistance Act.  As a result, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (CARES Act), which the President signed into law on March 27, 2020.  The CARES Act provides over $2 trillion in economic relief protections to the American people for the public health and economic impacts of COVID-19.

     11.  Prior to the enactment of the CARES Act, to be eligible for UI administered by EDD, a person must have been employed and worked in California and received at least a certain amount of wages from an employer in the 18 months preceding his/her UI benefits claim.  Because of this requirement, self-employed workers, independent contractors, and employees with insufficient earnings were not eligible to receive regular UI benefits.

     12.  The CARES Act established a new program – Pandemic Unemployment Assistance (PUA) -- to provide unemployment benefits during the COVID-19 pandemic to people who do not qualify for regular unemployment insurance benefits including business owners, self-employed workers, independent contractors, and those with a limited work history who are out of business or have significantly reduced their services as a direct result of

the pandemic.  UI benefits provided under the PUA program are sometimes referred to as PUA benefits.

13.  Under the PUA provisions of the CARES Act, a person who is a business owner, self-employed worker, independent contractor, or gig worker can qualify for PUA benefits administered by EDD if s/he previously performed such work in California and is unemployed, partially unemployed, unable to work, or unavailable to work due to a COVID-19-related reason.[1] Examples of non-business-owner occupations that may qualify a person for PUA benefits are realtor, barber, hairstylist, freelance photographer, construction handyman/woman, gardener, and ride-share driver.[2]

14.  California EDD began accepting applications for PUA

---

[1] COVID-19 related reasons for being out of work include: being diagnosed with COVID-19 or experiencing symptoms of COVID-19 and seeking a medical diagnosis; being unable to work because a health care provider advised self-quarantining due to concerns related to COVID-19; having a household member who has been diagnosed with COVID-19; providing care for a family or household member who has been diagnosed with COVID-19; having primary caregiving responsibility for a child or other household member who is unable to attend school or another facility that is closed as a direct result of the COVID-19 and the school or facility care is required for the claimant to work; becoming the breadwinner or major support for a household because the head of household died due to COVID-19; the claimant has quit his/her job due to COVID-19; the place of employment has closed due to COVID-19; a job that the claimant was scheduled to start is no longer available due to the COVID-19 public health emergency; or the place of employment is inaccessible due to the COVID-19 public health emergency.

[2] To be eligible, such person must also not be participating in the UI Elective Coverage program.  Under the provisions of the California Unemployment Insurance Code (CUIC), employers may elect UI and State Disability Insurance (SDI) or only Disability Insurance (DI) coverage for themselves.  Self-employed individuals, who are not employers, may only elect SDI coverage for themselves.

benefits on or about April 28, 2020.  To make benefits available
as quickly as possible, payments are issued in phases.  If a
claimant qualifies for PUA benefits, the minimum payments are as
follows based on the claim's start date:

> Phase 1: For claims with start dates from February 2
> to March 28, 2020, $167 per week for each week the
> claimant is unemployed due to COVID-19.
> Phase 2: For claims with start dates from March 29 to
> July 25, 2020, $167 plus $600 per week for each week
> the claimant is unemployed due to COVID-19.
> Phase 3: For claims with start dates from July 26 to
> December 26, 2020, $167 per week for each week the
> claimant is unemployed due to COVID-19.

15.  PUA applicants may be eligible for more than the
minimum weekly benefit amount of $167 if their annual income for
2019 reported on the PUA application meets a minimum threshold.

16.  A UI claimant can usually collect 26 weeks of regular
state UI benefits.  The CARES Act provides for additional
Pandemic Emergency Unemployment Compensation (PEUC), which
provides up to 13 weeks of additional payments, for a total of
39 weeks of benefits.  PEUC is available to persons who were or
are fully or partially unemployed at any time between from March
29 through December 26, 2020.  Persons with a regular UI claim,
a PUA claim or a PEUC extension filed between March 29 and July
25, 2020, also receive Federal Pandemic Unemployment
Compensation ("FPUC"), which is the extra $600 per week.

17.  Persons applying for PUA benefits do not need to

submit any supporting documents to the EDD with their
applications.  Claimants enter their total income for the 2019
calendar year on the application.  The stated income will be
used to pay the minimum benefits of $167 per week.  EDD may
request documentation to provide proof of the stated income.[3]  If
the income information provided by the PUA claimant meets an
annual earnings threshold of $17,368 or more, the EDD will work
as quickly as possible to verify the claimant's income using
other resources available to EDD in order to increase the PUA
weekly benefit amount.

18.  Like regular UI claims, PUA claims can be filed
online.  When an individual files a PUA claim online, EDD
automatically maintains certain information regarding the filing
of the claim.  This information includes the date and time the
claim was submitted, the name of the person for whom the claim
was filed, and the IP address of the computer, or ISP account,
that was used to file the claim.

19.  A PUA claimant must answer various questions to
establish his/her eligibility for PUA benefits.  The claimant
must provide his/her name, Social Security Number, and mailing
address.  The claimant must also identify a qualifying
occupational status and COVID-19 related reason for being out of
work.

20.  After it accepts a UI claim, including a claim
submitted pursuant to the PUA program, EDD typically deposits UI

---

[3] In general, EDD accepts items such as an annual tax
return, 1099 forms, W-2s, and pay stubs as proof of income.

funds every two weeks to an EBP debit card administered by the BofA, which the claimant can use to pay for his/her expenses. The EBP card is sent via the U.S. Postal Service to the claimant at the address the claimant provides in their UI claim. Claimants can activate their debit card over the phone or online.

21. When receiving regular UI benefits, a claimant must complete a Continued Claim Form (DE 4581) and certify every two weeks, under penalty of perjury, that he/she remains unemployed and eligible to receive UI benefits. EDD authorizes and deposits payment to the EBP debit card after it receives the Continued Claim Form. At present, weekly PUA benefits typically range from $40 to $450. In order to receive the maximum weekly benefit of $450, a claimant must have earned $11,674.01 or more in the highest quarter of the claimant's base employment period.

22. The submission of the PUA claims cause mailings to the addresses provided on the claims, including mailings of Electronic Benefit Payment (EBP) debit cards administered by Bank of America (BofA)that are used to access the fraudulently obtained UI benefits. The co-schemers and their associates, use the EBP debit cards to withdraw the fraudulently obtained UI benefits by making cash withdrawals at Automated Teller Machines and point of sale (POS) purchases at merchants across the United States.

23. Based on my training and experience, I know that individuals scheming to fraudulently obtain UI benefits generally follow recognizable patterns, including, among other

indicia:

       a.    Co-schemers commonly buy or outright steal the identities of other people to file for fraudulent UI benefits in the ID-theft victims' names and then collect the UI funds. Co-schemers commonly withdraw UI benefits via ATMs or make POS purchases at merchants for goods and services.

       b.    Using addresses the schemers control as the addresses submitted to EDD for the claims so that EBP debit cards and other EDD correspondence will be mailed to these addresses and thus be accessible to the schemers.

       c.    Submitting multiple UI claims from the same IP address for multiple claimants.  These claims are sometimes submitted on the same day close in time.

       d.    Failing to provide a phone number for provide a wrong number on multiple UI claims so it may be difficult to reach the identity holder.

    **C.**    **KIRK-CONNELL's arrest in September 2020 by local law enforcement and subsequent confession**

    24.   On or about September 11, 2020, Murrieta Police Department Detective Jeremy Meadows informed me that KIRK-CONNELL (who was a probationer on Post Release Community Supervision (PRCS)[4]) had just been arrested in the city of

---

    [4] PRCS is a form of supervision provided to an offender who has been released from a California Department of Corrections and Rehabilitation (CDCR) institution to the jurisdiction of a county agency, pursuant to the Post Release Community Supervision Act of 2011.  California Penal Code Section 3451 states that all persons released from prison on or after October 1, 2011, after serving a prison term for a felony and, if eligible, upon release from prison shall be subject to

Murrieta, California,[5] on an outstanding state warrant and for other charges.[6]  I then obtained the police reports, evidence, and related items from Murrieta PD, which I reviewed and from which I know the following:

25.  On September 10, 2020, Murrieta PD conducted a traffic stop of a vehicle bearing California license plate XXXX780. That vehicle was registered to KIRK-CONNELL, but was being driven by her boyfriend R.A.  Officers determined that R.A. was on parole and also had three active felony warrants for his arrest.  Murrieta PD officers placed R.A. under arrest and conducted a parole search of the vehicle.  During the search of the vehicle, the following items were discovered inside:

a.   A .40 caliber handgun and ammunition;

b.   Narcotics;

c.   Numerous items and forms with other individuals Personally Identifiable Information (PII);

d.   Four EDD EBP debit cards in the names of Y.Y., M.T., E.L., and A.G.;

---

supervision provided by a county agency.  Once released to PRCS, the offender is discharged from CDCR which no longer has jurisdiction of the offender.  KIRK-CONNELL's PRCS conditions included the following among other things: (1) obey all laws, ordinances, and court orders and (2) submit to an immediate search and seizure of your person and property, including any and all residences, premises, storage, unit, containers or vehicles accessible to or under your control at any time, by any law enforcement or Probation officer, with or without a warrant and with or without reasonable cause.

[5] Murrieta is located in Riverside County, which is one of the counties within the Central District of California.

[6] According to the Murrieta PD report, KIRK-CONNELL had a "no bail" felony warrant under California Penal Code § 3455 (violation of term of probation).

e.   Approximately $28,000 in U.S. currency;

f.   Documentation from Life Storage relating to storage unit 1065; and

g.   A storage unit key.

26.   The vehicle was then impounded.

27.   On September 10, 2020, a records check by Murrieta PD revealed that KIRK-CONNELL was on PRCS and had an outstanding warrant for her arrest.

28.   On September 10, 2020, Det. Meadows sought a warrant to install a tracking device on KIRK-CONNELL's vehicle as well as a search warrant for units 1065 and 1162 at Life Storage located in Wildomar, California.  The Honorable James T. Latting, Judge of the Riverside Superior Court, authorized and signed those tracking and search warrants, and officers installed a tracking device on KIRK-CONNELL's vehicle.

29.   On September 11, 2020, data from the tracking device indicated that KIRK-CONNELL's vehicle was at the Life Storage location.

a.   Det. Meadows and patrol officers responded to that location and encountered KIRK-CONNELL inside her vehicle.

b.   Officers detained KIRK-CONNELL and placed her under arrest for an outstanding felony warrant.

30.   Officers then searched KIRK-CONNELL's vehicle and found the following items:

a.   Eight EDD EBP debit cards in the names of others:

i.   Card ending in 5412 in the name of K.M.

ii.  Card ending in 6127 in the name of S.H.

iii. Card ending in 8441 in the name of A.B.

iv.  Card ending in 6775 in the name of R.M.

v.   Card ending in 7443 in the name of J.G.

vi.  Card ending in 6660 in the name of S.S.

vii. Card ending in 3047 in the name of C.J.

viii.   Card ending in 2579 in the name of E.H.

b.   One EDD EBP debit card in her name.

c.   BofA ATM receipts showing numerous cash withdrawals conducted on September 11, 2020, at a BofA ATM located on Clinton Keith Rd. in the City of Murrieta, which totaled approximately $5,400 and included withdrawals relating to debit cards in the names of K.M. (card ending in 5412) and S.H. (card ending 6127).

d.   $5,607 in U.S. currency.

e.   Two Samsung cell phones.

f.   Two hotel room keys.

g.   An Arizona driver's license in the name of C.R.

h.   A key to storage unit 1162 at Life Storage.

31.   After KIRK-CONNELL was arrested, she was transported to the Murrieta PD station.  After being read her *Miranda* rights, KIRK-CONNELL agreed to speak to Det. Meadows, who then conducted an audio-recorded interview of KIRK-CONNELL.  I reviewed that recording and the police report of KIRK-CONNELL's statement, from which I learned the following:

a.   KIRK-CONNELL confirmed her boyfriend was R.A., who had been driving her vehicle when he was arrested.

b.   KIRK-CONNELL admitted to filing fraudulent UI

benefit claims with EDD by using personal identification information from stolen identities, as well as loaned social security numbers from friends and associates.

c.   KIRK-CONNELL knew people who accessed the "dark web" to purchase PII that KIRK-CONNELL then used to file fraudulent UI claims with EDD.

d.   KIRK-CONNELL acknowledged having limited employment history and admitted to also filing a fraudulent UI claim in her own name.

e.   KIRK-CONNELL also assisted R.A. in filing a UI claim in his name.

f.   KIRK-CONNELL said she also helped other people apply for EDD benefits.

g.   KIRK-CONNELL acknowledged knowing the PII used to file the fraudulent UI claims belonged to real people who had not filed for UI benefits with EDD and were unaware of such claims being filed in their names.

h.   Once the fraudulent claims were filed and KIRK-CONNELL received the debit cards, she would activate the debit card by creating a PIN number of her choice that she later used to make cash withdraws from the cards.

i.   KIRK-CONNELL admitted to keeping records relating to her identity theft scheme in her hotel room.

j.   KIRK-CONNELL admitted to using the some EDD EBP debit cards she possessed at the time of her arrest to withdraw cash at a BofA ATM earlier that day.

k.   KIRK-CONNELL believed some of the money possessed

by R.A. derived from her fraudulent EDD scheme.

　　　　l.　KIRK-CONNELL suggested there were others involved in the EDD scheme but was reluctant to disclose their names for fear of getting them in trouble.

　　　　m.　KIRK-CONNELL admitted to possessing an Arizona driver's license in the name of C.R., claiming C.R. was a friend that looked like her.

　　　　n.　KIRK-CONNELL admitted to using the Arizona driver's license in the name of C.R. to open storage unit 1162, which she said she did because she did not want to open the storage unit in her name because she was on PRCS and wanted.

　　　　o.　KIRK-CONNELL stated that she had watched "You Tube" videos that instructed how to commit EDD fraud.

　　**D.**　　**Storage unit numbers 1065 and 1162**

　　32.　On September 10, 2020, Murrieta detectives spoke to the staff at Life Storage located in Wildomar, California, who confirmed that the key located in the vehicle driven by R.A. (discussed above) opened storage unit no. 1065.

　　　　a.　The staff also told the detectives that a female claiming to be C.R. (the identity on the Arizona driver's license that KIRK-CONNELL had with her when arrested) had just called.

　　　　b.　The staff reported that the caller ID associated with the phone number ending in 7448 from that call showed "Cara Kirkconnell" as the caller.

　　　　c.　The detectives conducted a records check for that phone number ending in 7448 and discovered that it was

14

registered to KIRK-CONNELL.

          d.   The detectives showed KIRK-CONNELL's driver's
license photograph to the staff at the storage location, who
confirmed that KIRK-CONNELL was the female who had opened the
account for storage unit no. 1162 in the name of C.R.

          **E.   <u>KIRK-CONNELL's hotel room</u>**

          33.   In or about September 2020, I received and reviewed a
copy of a hotel folio from Home2 Suites by Hilton, in Temecula,
California.   From that review, I know the following:

          34.   KIRK-CONNELL rented room #315 at that hotel in her
name from September 7 to 9, 2020, and used a visa ending in 6127
to pay for it.

          35.   The same room at that hotel (Room #315) was rented in
the name of C.P. starting on September 10, 2020, with KIRK-
CONNELL listed as a second guest in the room.   A visa ending in
5412 to pay for it.

          36.   As detailed below, the credit card ending in 6127
corresponded to the fraudulently obtained EDD card in the
identity of S.H., which is one of the EDD cards KIRK-CONNELL had
with her when she was arrested on September 11, 2020.

          **F.   <u>Evidence seized from KIRK-CONNELL's vehicle and the
               searches of KIRK-CONNELL's hotel room and storage
               units</u>**

          37.   In late September 2020, I visited the Murrieta PD and
took possession of evidence related to KIRK-CONNELL's identity
theft/UI fraud scheme.   That evidence included items seized from
KIRK-CONNELL's person, vehicle, hotel room, and storage units

1065 and 1162, including digital devices.

38. Based upon my review of that evidence, I discovered that the following was seized during those searches:

a. Eight EDD EBP debit cards in the names of others from KIRK-CONNELL's vehicle when she was arrested on September 11, 2020 (listed above).

b. Four EDD EBP debit cards in the names of others from KIRK-CONNELL's vehicle when her boyfriend R.A. was arrested driving it on September 10, 2020;

c. Four bank credit/debit cards in the names of Y.K., A.L., M.V., and M.F. (in storage unit no. 1162).

d. Two Arizona driver's licenses in the names of C.R. and J.M.

e. Three California driver's licenses in the names of Y.K., T.D., and V.V.

f. One U.S. Employment Authorization card in the name of E.G.

g. Envelopes mailed from EDD;

h. Numerous notepads, notebooks, and similar journals containing PII, EDD account numbers, emails, addresses, login information to include passwords, and account balances.

i. Handwritten rosters tracking the following with the respect to the EDD scheme:

i. Filed and pending UI claims with EDD.

ii. PII used to file UI claims.

iii. Addresses used to mail EBP debit cards.

**G.    Research re: EDD cards seized from KIRK-CONNELL**

39.    On September 30, 2020, a BofA investigator informed me that at least two of the seven EBP debit cards KIRK-CONNELL possessed at the time of her arrest were used to pay for goods or services on at least four occasions between August 31, 2020, and September 11, 2020, at the following POS terminals for the following amounts:

a.    Card ending in 5412 in the name of K.M. August 31, 2020, for $519.29 at Wal-Mart in Murrieta, California.

b.    Card ending in 5412 on September 1, 2020, for $422.69 and $232.74 at Wal-Mart in Murrieta, California.

c.    Card ending in 6127 in the name of S.H. on September 11, 2020, for $364.79 at Home to Suites by Hilton in Temecula, California.

40.    I obtained copies of three receipts and surveillance photographs from Wal-Mart, from which I discovered:

a.    On or about August 31, 2020, a Caucasian female fitting the physical description of KIRK-CONNELL made a purchase for $519.29 at Wal-Mart in Murrieta, California.

b.    On or about September 1, 2020, a Caucasian female fitting the physical description of KIRK-CONNELL made two purchases in the amounts of $422.69 and $232.74 at Wal-Mart in Murrieta, California.

**H.    Identity theft victim K.M.**

41.    As noted above, one of the EDD cards that KIRK-CONNELL had with her when she was arrested was in the name of K.M.

42.    Based on my review of records provided to me by EDD, I

know the following:

a.   On August 10, 2020, a PUA claim was filed with EDD stating that the claimant K.M. was unemployed because of the COVID 19 pandemic.

b.   The PUA application contained K.M.'s name, DOB, SSN, and alleged that she was a self-employed auto detailer.

c.   The claim utilized a mailing address in Temecula, California.

d.   The filing of the PUA claim triggered a EBP debit card ending in 5412 to be generated in the name of K.M.

43.   On September 30, 2020, I interviewed K.M. by telephone about the PUA claim that had been filed in his name.   During that interview, K.M. told me the following:

a.   K.M. is retired from working at a Chinese restaurant no longer in business, which was previously located in Riverside, California.

b.   K.M. confirmed that the DOB and SSN provided on the PUA claim in her name belonged to her.

c.   K.M. had never been employed as an auto detailer.

d.   K.M. never lived in Temecula, California.

e.   K.M. never filed a PUA claim with EDD and did not authorize anyone to file a claim in her name.

   **I.   Identity theft victim S.H.**

44.   As noted above, one of the EDD cards that KIRK-CONNELL had with her when she was arrested was in the name of S.H.

45.   Based on my review of records provided to me by EDD, I know the following:

      a.   On August 4, 2020, a PUA claim was filed with EDD stating that the claimant S.H. was unemployed because of the COVID 19 pandemic.

      b.   The PUA application contained S.H.'s name, DOB, SSN, and alleged that he was a self-employed nail technician.

      c.   The claim utilized a mailing address in Lake Elsinore, California.

      d.   The filing of the PUA claim triggered an EBP debit card ending in 6127 to be generated in the name of S.H.

46.   On October 6, 2020, IRS-CI SA Errol Watson interviewed S.H. regarding the PUA claim that had been filed in his name. During that interview, S.H. provided the following information:

      a.   S.H. is retired and did not file any claims with EDD.

      b.   After being shown a photo of KIRK-CONNELL and R.A., S.H. denied recognizing or knowing either of them.

      c.   S.H. did not give permission to anyone to use his identity information.

**J.   Other identities from cards seized from KIRK-CONNELL**

47.   Between September 30, 2020 and October 6, 2020, I reviewed a sampling of queries from a law enforcement database relating to possible identity theft victims C.J., R.M., and J.G., which were some of the cards found in KIRK-CONNELL's possession when she was arrested on September 11, 2020. The results revealed the following:

      a.   C.J. appears have been incarcerated in the custody of the Riverside County Sheriff's Department since

February 18, 2020.[7]

       b.   R.H appears to reside and work in the State of Nevada and does not appear to have any work or residential history in California.

       c.   J.G. appears to reside and work in the State of Idaho or Nevada and does not appear to have any work or residential history in California.

    **K.**   **Analysis of PII seized from KIRK-CONNELL and inside her hotel room and storage locations**

48.  As discussed above, searches were conducted of the hotel room and storage location that KIRK-CONNELL was using.  I reviewed the evidence seized from those locations, including notebooks and random sheets containing PII.

49.  From those items, I was able to identify more than 50 identities.

50.  I provided that identity information to California EDD Criminal Investigator Daniel Schmidt, who researched whether those identities had been used to file for PUA claims with EDD, and provided me the following information:

       a.   Approximately 54 PUA claims had been filed in those identities with EDD, and EDD cards had been issued in the names of those individuals and mailed to them.

       b.   The amount of EDD funds loaded on those EDD cards totaled approximately $534,149.

---

[7] The PUA claim for C.J. was filed with EDD on July 17, 2020, which would have made C.J. ineligible for UI benefits since he was incarcerated at the time and not available and willing to work.

c.   Of that amount, approximately $269,208 had been spent.

d.    Most of the applications corresponding to the eight EDD cards found with KIRK-CONNELL when she was arrested were filed during July and August 2020.

e.   KIRK-CONNELL filed the claim with EDD in her own name on or about May 28, 2020.

**L.   KIRK-CONNELL's criminal history**

51.  I obtained and reviewed KIRK-CONNELL's rap sheet, which lists her criminal history.  From that review, I know the following:

52.  KIRK-CONNELL is a convicted felon with a criminal history dating back to 2006, which includes multiple probation violations.

53.  Her criminal history includes 2006 and 2007 convictions for driving under the influence; a 2008 conviction for inflicting corporal injury on a spouse or cohabitant and misdemeanor vandalism; a 2011 conviction for receiving stolen property; a 2012 conviction for possession and purchase of narcotics/controlled substance, transportation and sell of narcotics/controlled substance, child cruelty, fleeing while on bond; a 2014 conviction for DUI and grand theft of access cards; a 2015 conviction for burglary; a 2017 conviction for possession of ID of 10+ persons with intent to defraud; and a 2018 conviction for use of an ID with intent to defraud.

**V.  CONCLUSION**

54.  Based on the information set forth above, there is

probable cause to believe that CARA MARIE KIRK-CONNELL violated

Title 18, United States Code, Sections 1029(a)(2) (access device

fraud), 1028(A)(a)(1) (aggravated identity theft), and 1341

(mail fraud).


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this __9__ day of
October 2020.


_____/s/ Autumn D. Spaeth_____
HONORABLE AUTUMN D. SPAETH
UNITED STATES MAGISTRATE JUDGE